## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| KARINA QUIÑONES, et al., | CIVIL No. 14-1331 (JAG) |
| Plaintiffs, | |
| v. | |
| UNIVERSITY OF PUERTO RICO, et al., | |
| Defendants | |

## MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM
## UNDER Fed. R. Civ. P. 12(b)(6) and/or 12(c)

**TO THE HONORABLE COURT**:

**COME NOW** Defendants University of Puerto Rico ("the University" or "UPR") and the individual co-defendants in their official capacities, Uroyoan Walker Ramos as President of the University; Dr. Rafael Rodríguez Mercado; Dr. Edgar Colón Negrón; Dr. Pedro J. Santiago Borrero; and Dr. Luis A. Serrano Torres, through the undersigned counsel, and respectfully submit this Motion to Dismiss, based on the complaint's failure to state a claim upon which relief could be granted. First, the Complaint does not state the violation of a constitutional right, failure that would require the dismissal of the claims under 42 U.S.C. § 1983. Plaintiff fails to state a plausible claim under the due process and under the equal protection clauses, which is related to her failure to state an actionable disability discrimination claim, as the complaint's averments are also insufficient to state an ADA claim. Second, the ADA does not provide for individual liability. Third, the averments of the complaint fail to state a claim under Titles II and V of the Americans with Disabilities Act.

In sum, the shortcomings of the Complaint warrant a dismissal under Fed. R. Civ. P. 12(b)(6) and/or 12 ( c), as well as 8(a)(2). In their support, Defendants further state, expound and pray as follows:

## I.    INTRODUCTION

1.1    The complaint, filed on April 22, 2014 (Docket no. 1), alleges disability discrimination and retaliation. Specifically, it avers that plaintiff Karina Quiñones (hereinafter "Plaintiff" or "Quiñones") was admitted in July, 2011 -and enrolled- in the Ophthalmology Residency Program of the University of Puerto Rico School of Medicine. ***Complaint***, ¶ 25. Prior to that, in March, 2011, she had enrolled in an alcohol rehabilitation program. ***Complaint***, ¶ 26. Plaintiff was released from a rehabilitation facility with a number of prescriptions. She began using medication during July, 2011, "in a manner not prescribed by her physician." Moreover, her psychiatrist prescribed her Adderall, "to enhance focus during her residency training." ***Id***., ¶ 27. Quiñones "developed an addiction to Adderall causing her visual disturbances, speech problems and dizziness." ***Id***., ¶ 28.

1.2    The complaint further avers that "As a rehabilitated alcoholic and being in active addiction to Adderall, Soma and Ambien [Quiñones] began to have problems complying with certain requirements of the residency program." ***Id***., ¶ 29. On September 10, 2012, "Defendants decided to permanently withdraw [Plaintiff] from [the residency program]." ***Id***., ¶ 30. On September 27, 2012, Plaintiff filed an action in Puerto Rico courts, requesting her immediate reinstatement to the residency program. ***Id***., ¶ 31. On October 9, 2012, the parties reached an agreement that included plaintiff's withdrawal of the Puerto Rico court complaint, without prejudice. She would have the "opportunity to formally request reasonable accommodation in writing." ***Id***., ¶¶ 32 & 33.

1.3     On October 22, 2012, Plaintiff "submitted in writing her reasonable accommodation request." *Id*., ¶ 34. Her request was to be reinstated to the residency program. *Id*., ¶ 37. The decision to reject her request was informed to her on April 29, 2013. *Id*., ¶ 38.

1.4     The complaint's relevant legal conclusions are the following: I) Plaintiff is a qualified individual with a disability as defined by Chapter II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. sec. 12131. *Id*., ¶ 46; ii) She "is disabled within the meaning of the Rehabilitation Act in that she is an individual with an impairment that substantially limits one or more major life activities, as defined by Sec. 504 of the Rehabilitation Act, 29 U.S.C. sec. 705(20)(B), incorporating by reference 42 U.S.C. sec. 12102." *Id*., ¶ 47; iii) She has a mental impairment or disability that substantially limits her major life activities, "including but not limited to attending school, learning, concentrating, and social interaction." *Id*., ¶ 11; iv) Defendants regarded Plaintiff "as a individual with a disability under 29 U.S.C. sec. 705(20)(B), incorporating by reference 42 U.S.C. sec. 12102." *Id*., ¶ 48; v) Plaintiff "was and is qualified to participate" in the residency program. *Id*., ¶ 49; vi) By forcing her out and not granting her a reasonable accommodation, Defendants "have excluded her from participation in, denied her the benefit of, and subjected her to discrimination in a program or activity receiving federal financial assistance, in violation of 29 U.S.C. sec. 794(a)." *Id*., ¶ 50; vii) Defendants retaliated against Plaintiff "because she demanded her rights under the [ADA] and opposed practices and policies that she understood violated the ADA." *Id*., ¶ 52.

1.5     Quiñones also relied on 42 U.S.C. § 1983, affirming that "[t]he actions taken by the Defendants in this case were taken under color of state law." *Id*., ¶ 57. She adds that "Defendants are liable to [her] under the [ADA] and [42 U.S.C. § 1983] in the amounts set forth [in the complaint] as well as costs and attorneys' fees." *Id*., ¶ 60. However, the complaint avers that the

3

individual defendants were sued only in their official capacity and plaintiff made clear in her motions of June 30, 2014 (docket no. 27 & 28) that such is the case. Indeed, in her "Response in Opposition to Motion for a More definite Statement," plaintiff asserted that "none of the named Defendants have been included in this claim as individual defendants in order from them individually to respond to Plaintiff for compensatory damages" and that "[a]ll compensatory damages are requested from the University of Puerto Rico and the University of Puerto Rico School of Medicine." (Docket no. 27, at 2). *In the Joint ISC Memorandum, submitted by the parties on August 6, 2014* (Docket no. 35)*, plaintiff requested the dismissal without prejudice of her section 1983 claims*). Indeed, at the Initial Scheduling Conference held on August 14, 2014, plaintiff reiterated her request and the Magistrate Judge recommended that all claims in the complaint under Title 42 U.S.C. Section 1983 and all claims under the laws of Puerto Rico be dismissed without prejudice. (Docket no. 39, ¶ 2 at 2).

  1.6 Plaintiff also included supplemental claims under Commonwealth law, alleging that her factual averments support claims under Puerto Rico Act. No. 44 of July 2, 1985, 1 L.P.R.A. § 501, which allegedly "prohibits discrimination against disabled persons and requires that efforts be made, by employers and educational institutions, to reasonably accommodate a person's disability." *Id*., ¶ 63. Quiñones also avers that she is entitled to recover damages as a "victim of disability discrimination" under Articles 1802 and 1803 of the Puerto Rico Civil Code, 31 L.P.R.A. §§ 5141 & 5142. *Id*., ¶ 66. (However, *in the Joint ISC Memorandum, submitted by the parties on August 6, 2014,* (Docket no. 35) *plaintiff requested the dismissal without prejudice of supplemental, Puerto Rico law claims*). At the Initial Scheduling Conference held on August 14, 2014, plaintiff reiterated her request and Magistrate Judge López recommended that all claims in the complaint under the laws of Puerto Rico be dismissed without prejudice. (Docket no. 39).

4

1.7     As it is discussed further, *infra*, it is significant that Quiñones does not allege that other residents who failed to meet the requirements of the Ophthalmology Residency were treated more favorably than she was. As it is expounded further, that omission is significant, because her discrimination averments are mere conclusions, with no facts to support it. Moreover, her failure-to-accommodate averments fail, basically because what she requests is her reinstatement in the Residency Program, with no conditions or modifications. For instance, she does not request to work less hours than the rest of the residents or other modifications to her training regimen and/or work schedule or responsibilities. That omission belies her allegation that she is disabled and that her disability impairs major life activities which require an accommodation and/or create the perception that she has a disability. As it is discussed in detail herein below, those and other shortcomings of the complaint leave a non-plausible ADA claim, requiring the dismissal of the complaint in the instant case.

## II.   ARGUMENT

### A.   THE DISMISSAL STANDARD

2.1     Under Federal Rule of Civil Procedure 12(b)(6), the applicable inquiry is whether the allegations of the complaint, read in the light most favorable to the plaintiff, state a claim upon which relief can be granted. As the Court of Appeals for the First Circuit has explained, courts must apply a "forgiving standard" that requires the denial of a request for dismissal every time that "the well-pleaded facts, taken as true, justify recovery on any supportable legal theory." Cruz v. Melecio, 204 F.3d 14, 21 (1st Cir. 2000). Explained further the Court:

> The jurisprudence of Rule 12(b)(6) requires us to consider not only the complaint, but also matters fairly incorporated within it and matters susceptible to judicial

notice. From this amalgam, we extract the well-pleaded facts and draw all reasonable inferences favorable to the complainant.

*Id*. at 21-22 (citations omitted).

2.2     However, in doing so, courts should "eschew any reliance on bald assertions [and] unsupportable conclusions." Chongris v. Board of Appeals, 811 F.2d 36, 37 (1st Cir. 1987). That is, Rule 12(b)(6) "is not entirely a toothless tiger." Dartmouth Review v. Dartmouth College, 889 F.2d 13, 16 (1st Cir. 1989). A plaintiff is still "required to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Gooley v. Mobil Oil Corp., 851 F. 2d 513, 515 (1st Cir. 1988).

2.3     That is why Rule 8(a)(2) requires plaintiffs to provide in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." As the Court of Appeals for the First Circuit held, eschewing bald assertions and unsupportable conclusions "is merely an application of Rule 8(a)(2), not a heightened pleading standard uniquely applicable to civil rights claims." Educadores Puertorriqueños en Acción v. Rey Hernández, 367 F.3d 61, 68 (1st Cir. 2004).

2.4     Moreover, courts must require plaintiffs to allege in their complaints "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). That means that plaintiffs have to nudge "their claims across the line from conceivable to plausible." *Id*. Otherwise, their complaints must be dismissed. *Id*. *See also* Ashcroft v. Iqbal, 556 U.S. 662, 683 (2009) . Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S., at 678. In short, once the mere conclusions and formulaic allegations are discarded, the averments that qualify as factual allegations must state a plausible claim for relief. Otherwise, dismissal is the only appropriate result.

2.5     Even if this motion is construed as a motion to dismiss under the pleadings pursuant to Fed. R. Civ. P. 12 ©, the standard is virtually identical. *See* <u>Aponte Torres</u> v. <u>University of Puerto Rico</u>, 445 F.3d 50, 54 (1ˢᵗ Cir. 2006)("Because the defendants previously had answered the amended complaint, the district court appropriately treated their motion to dismiss as one for judgment on the pleadings. See Fed.R.Civ.P. 12©. This conversion does not affect our analysis inasmuch as the two motions are ordinarily accorded much the same treatment "). Applying the aforesaid legal standard to this case requires the dismissal of all claims against Defendants under Fed. R. Civ. P. 12(b)(6) and/or 12 ( c ).

**B.    THE COMPLAINT FAILS TO ALLEGE A CONSTITUTIONAL VIOLATION COGNIZABLE UNDER THE FOURTEENTH AMENDMENT. THUS, THE ALLEGATIONS OF VIOLATIONS TO THE CIVIL RIGHTS ACT ARE INSUFFICIENT AS A MATTER OF LAW. BY THE SAME TOKEN, THE AVERMENTS OF THE COMPLAINT FAIL TO STATE A PLAUSIBLE CLAIM UNDER TITLE II OF THE ADA. GIVEN THOSE SHORTCOMINGS, THE ADA CLAIMS MUST BE DISMISSED.**

2.6     The Complaint in the present case sustains that the alleged disability discrimination and failure to provide reasonable accommodation violated Plaintiff's constitutional and/or statutory rights, violation that is purportedly actionable pursuant to 42 U.S.C. § 1983. Provided that such allegation can be construed as an equal protection claim and/or a due process claim, this Court must evaluate whether "any of the University's conduct that [allegedly] violated Title II independently states a violation of the Fourteenth Amendment." <u>Toledo</u> v. <u>Sánchez</u>, 454 F.3d 24, 32 (1ˢᵗ Cir. 2006). As the Court of Appeals stated in <u>Toledo</u>, there are "two potential sources of constitutional rights in the context of discrimination or a failure to accommodate a disability in public education: the Due Process and the Equal Protection Clauses of the Fourteenth Amendment." 454 F.3d at 32. Although plaintiff announced that it is requesting the dismissal without prejudice of her section 1983 claim,

a brief discussion of its shortcomings on the merits is in order, inasmuch as the same are related to the deficiencies of her ADA/Rehabilitation Act claims.

   a.   **Plaintiff Avers No Due Process Violation**

2.7   The Due Process Clause guarantees some notice and an opportunity to be heard before a student can be suspended or expelled from school. Goss v. Lopez, 419 U.S. 565, 574 (1975). These rights are implicated when a student's future attendance at a public institution of higher education is in jeopardy. *See also* Gorman v. Univ. of R.I., 837 F.2d 7 (1st Cir. 1988). However, since in the present case plaintiff does not raise a due process violation claim, her Title II claims raise no due process concerns.

   b.   **Plaintiff's Averments Could Not State a Cognizable Equal Protection Claim**

2.8   Plaintiff avers that, by forcing her out of the residency Program, Defendants "have excluded her from participation in, denied her the benefit of, and subjected her to discrimination in a program or activity receiving federal financial assistance, in violation of 29 U.S.C. sec. 794(a)." *Complaint*., ¶ 50. Quiñones adds that she is entitled to recover damages as a "victim of disability discrimination" (*id*., ¶ 66) under, *inter alia*, 42 U.S. C. § 1983.

2.9   The Equal Protection Clause requires states to treat alike all persons similarly situated. Plyler v. Doe, 457 U.S. 202, 216 (1982). To assess whether the University's conduct violated this guarantee, the Court must determine the appropriate level of scrutiny to be applied to plaintiff's claims. Toledo v. Sánchez, *supra*, 454 F.3d at 33. Unless state action burdens a suspect class or impinges upon a fundamental right, courts review equal protection claims for a rational relationship between the disparity of treatment and a legitimate government purpose. *Id*. (Citing Heller v. Doe, 509 U.S. 312, 319 (1993)). The disabled are not a suspect class for equal protection

purposes. *Id*. (Citing <u>City of Cleburne, Texas</u> v. <u>Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985)). In addition, public education is not a fundamental right. *Id*. (Citing <u>San Antonio Indep. Sch. Dist.</u> v. <u>Rodriguez</u>, 411 U.S. 1, 35, (1973). However, neither is education "merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation." <u>Plyler</u>, *supra*, 457 U.S. at 221.

2.10    The Supreme Court has "repeatedly acknowledged the overriding importance of preparing students for work and citizenship, describing education as pivotal to 'sustaining our political and cultural heritage' with a fundamental role in maintaining the fabric of society." <u>Grutter</u> v. Bollinger, 539 U.S. 306, 331 (2003) (quoting <u>Plyler</u>, 457 U.S. at 221). *See also* <u>Brown</u> v. <u>Board of Education</u>, 347 U.S. 483, 493 (1954); <u>Bolling</u> v. <u>Sharpe</u>, 347 U.S. 497, 499-500 (1954). Therefore, the Supreme Court struck down under heightened scrutiny the exclusion of a discrete group of children from a free public education offered to other resident children as violative of equal protection. <u>Plyler</u>, 457 U.S. at 230.

2.11    Nonetheless, aside from outright exclusion, the Supreme Court continues to employ rational basis review for classifications that burden the educational opportunities of a non-suspect class. *See* <u>Kadrmas</u> v. <u>Dickinson Public Sch.</u>, 487 U.S. 450, 459 (1988). Therefore, states may treat disabled students differently or refuse to make special accommodations for the disabled so long as the states' actions are rationally related to some legitimate governmental purpose. <u>Board of Trustees of the Univ. of Alabama</u> v. <u>Garrett</u>, 531 U.S. 356, 366-68 (2001). States may not, however, treat disabled students differently solely out of "irrational prejudice." <u>Cleburne</u>, 473 U.S. at 450.

2.12    Even reading the complaint generously, plaintiff has failed to allege that the University's failure to "accommodate" her situation was due to irrational prejudice and, indeed,

rational bases for the actions are apparent from the face of the complaint. Indeed, plaintiff admits in her complaint that "[a]s a rehabilitated alcoholic and being in active addiction to Adderall, Soma and Ambien [Quiñones] began to have problems complying with certain requirements of the residency program." ***Complaint***, ¶ 29.

2.13    Plaintiff also contends that defendants discriminated against her on the basis of an alleged disability, rather than merely failing to make an accommodation. But, although there is no heightened pleading standard for civil rights claims, mere conclusory allegations of discrimination unsupported by any facts are insufficient for notice pleading purposes. *See* Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d 61, 68 (1st Cir. 2004). In order to state a claim for discrimination that violates equal protection, plaintiff had to allege facts tending to show that she was intentionally treated differently from others similarly situated and that there was no rational basis for the difference in treatment. Toledo v. Sánchez, *supra*, 454 F.3d at 34.

2.14    In short, Plaintiff does not allege that other residents who had similar "problems complying with certain requirements of the program" received better treatment or were kept in the residency program. *See* Aponte-Torres v. University of Puerto Rico, 445 F.3d 50, 57 (1st Cir. 2006) (To plead a viable equal protection claim, a plaintiff must allege facts indicating selective treatment compared with others similarly situated based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.). Thus, plaintiff has failed to allege state conduct that independently states a claim for a violation of the Equal Protection Clause. Toledo, *supra*, 454 F.3d at 33-34.

c.    __The Complaint Fails to Aver a Plausible Claim Under Title II of the ADA__

2.15    As already noted, plaintiff has made it clear that she is suing the individual defendants only in their official capacities. Had that not been the case, the ADA in any event does not provide for individual liability. In <u>Fantini</u> v. <u>Salem State College</u>, 557 F.3d 22 (1st Cir. 2009), the Court of Appeals for  the First Circuit joined its sister circuits in holding that there is no individual liability under Title VII. Relying on statutory construction of similar language in the ADA, it has been held that there is no individual liability under the ADA. ADA's Title II provides disabled individuals redress for discrimination by a "public entity." *See* 42 U.S.C. § 12132. That term, as it is defined within the statute, does not include individuals. *See* 42 U.S.C. § 12131(1). <u>Alsbrook</u> v. <u>City of Maumelle, Arkansas</u>, 184 F.3d 999, 1005 n.8 (11th Cir. 1999). *See also* <u>Transamerica Mortgage Advisors, Inc.</u> v. <u>Lewis</u>, 444 U.S. 11, 19 (1979) ("[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."). Thus, the individual defendants "may not be sued in their individual capacities directly under the provisions of Title II." <u>Alsbrook</u>, *supra*, 184 F.3d at 1005, n.8. *See also* <u>Román-Oliveras</u> v. <u>PREPA</u>, 655 F.3d 43, 50-51 (1st Cir. 2011).

2.16    The ADA is divided into three main subchapters known as "Titles" and one relevant subchapter, known as Title V. **Title I** forbids discrimination against individuals with disabilities in the terms and conditions of employment; **Title II** prohibits discrimination against the impaired in access to public services; and **Title III** proscribes discrimination against disabled individuals in public accommodations. 42 U.S.C. §§ 12112; 12132; 12182. <u>Román</u> v. <u>University of Puerto Rico</u>, 799 F. Supp. 2d 120, 126-127 (D.P.R. 2011). *See also* <u>Collazo–Rosado</u> v. <u>University of Puerto Rico</u>, 775 F.Supp.2d 376, 383–84 (D.P.R.2011).

11

2.17    Title I of the ADA generally prohibits an employer from discriminating against an employee with a disability. 42 U.S.C. § 12112(a). The ADA also imposes on employers an affirmative duty to offer reasonable accommodation to an impaired, but otherwise qualified individual. Calero–Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 20 (1st Cir.2004). Of course, the Eleventh Amendment bars private money damages actions for state violations of ADA Title I. Tennessee v. Lane, 541 U.S. 509, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004). Therefore, the Commonwealth of Puerto Rico, and consequently the University of Puerto Rico, are immune to all monetary claims filed under Title I. Román v. University of Puerto Rico, *supra*, 799 F. Supp. 2d, at 127 (citing Torres–Alamo v. Puerto Rico, 502 F.3d 20 (1st Cir.2007)). *See also* Pinto v. University of Puerto Rico, 895 F.2d 18, 18 (1st Cir. 1990) (The University of Puerto Rico is considered an arm of the state within the purview of the Eleventh Amendment).

2.18    As the Supreme Court expounded in United States v. Georgia, 546 U.S. 151, 153-154 (2006), "Title II of the ADA provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.' [42 U.S.C.] § 12132 (2000 ed.). A 'qualified individual with a disability' is defined as 'an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.' § 12131(2). The Act defines 'public entity' to include 'any State or local government' and 'any department, agency, . . . or other instrumentality of a State,' § 12131(1). ... Title II authorizes suits by private citizens for money

damages against public entities that violate § 12132. See 42 U. S. C. § 12133 (incorporating by reference 29 U. S. C. § 794a)."

2.19    As the Court of Appeals for the First Circuit has stated, "'Disability' has a specific legal meaning. The statutory terms require that there be 'a physical or mental impairment that substantially limits one or more of the major life activities.' 42 U.S.C. §(s) 12102 (1994); 29 U.S.C. Section(s) 706(8) (1994)." <u>Bercovitch</u> v. <u>Baldwin School</u>, 133 F.3d 141, 155 (1ˢᵗ Cir. 1998). Plaintiff's averments and evidence must satisfy three distinct factors: (1)Plaintiff has a physical or mental impairment; (2) which affects a major life activity; (3) to a substantial degree. *Id*. (Citing <u>Abbott</u> v. <u>Bragdon</u>, 107 F.3d 934, 938-39 (1st Cir. 1997); <u>Soileau</u> v. <u>Guilford of Maine, Inc.</u>, 105 F.3d 12, 15 (1st Cir. 1997) (finding that plaintiff's dysthymia was not a disability because it did not substantially affect a major life activity)).

2.20    Under the ADA, "a covered entity" ... "may hold an employee who engages in the illegal use of drugs or who is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory such performance or behavior is related to the drug use or alcoholism of such employee." 42 U.S.C. § 12114(c)(4). That is, "the ADA expressly provides that an employer may hold an employee to the same standards for employment or job performance as all other employees, even if the unsatisfactory performance is related to the alcoholism of the employee." <u>Rollison</u> v. <u>Gwinnett County</u>, 865 F.Supp. 1564, 1572 (N.D.Ga.1994).

2.21    Indeed, the ADA provides that a covered entity may prohibit the use of alcohol at the workplace by all employees; may require that employees shall not be under the influence of alcohol at the workplace; and that the entity may hold an employee who engages in the illegal use of drugs

13

or who is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the drug use or alcoholism of such employee. 42 U.S.C. §§ 12114(c)(1), (2), (4). *See* Altman v. New York City Health and Hospitals Corp., 100 F.3d 1054, 1060 (2nd Cir. 1996).

2.22    A fairly detailed picture of four decisions should assist in the analysis of the sufficiency of the complaint in the present case. **First**, in Bercovitch v. Baldwin School, *supra*, Jason -then a 6th grader with disruptive and disrespectful behavior-, was suspended indefinitely by the private school he attended since first grade. After suspended, his parents claimed that he probably had Attention Deficit and Hyperactivity Disorder (ADHD) and brought the boy to a psychiatrist, who indeed diagnosed him as having ADHD. The school refused to reinstall the boy and the parents brought action in district court. The court held a hearing and issued a preliminary injunction. However, in vacating the injunction, the Court of Appeals found that "the district court misapprehended certain aspects of the law under the ADA and the Rehabilitation Act, and abused its discretion in granting injunctive relief." 133 F.3d at 151.

2.23    Although the Court of Appeals agreed "that learning is a major life activity," 133 F.3d at 155, it found against the plaintiffs, because the record showed "that Jason never experienced significant academic difficulties, and in fact has excelled academically for most of his years at the Baldwin School. Although Jason's hyperactivity and distractibility may affect his capacity to achieve his absolute maximum learning and working potential, there is practically no evidence that it has substantially impaired his basic learning abilities. Under the regulations for Title I of the ADA (which uses the same definition of disability as Title III), a person is 'substantially limited' in a major life activity when he is (I) Unable to perform a major life activity that the average person in the

general population can perform; or [is] (ii) Significantly restricted as to the condition, manner or duration under which [he] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 CFR Section(s) 1630.2(j)(1) (1997)." Bercovitch,133 F.3d at 155-156.

2.24   **Second**, there is Roth v. Lutheran, 57 F.3d 1446 (7th Cir. 1995), a case in which plaintiff doctor Roth, who had strabismus, filed a lawsuit under the Rehabilitation Act and the ADA, alleging that the hospital and various members of the resident selection committee discriminated against him in their selection process because of his eye disability, and also retaliated against him for exercising his rights to obtain legal redress under the Acts.

2.25   Dr. Roth applied to five pediatric residency programs and two psychiatry residency programs, all located in Chicago. In his relevant application, Roth stated that although he was born with strabismus, he no longer considered this an obstacle to his medical education because he had been fitted with a contact lens which corrected his visual acuity. **Like plaintiff in the present case**, Roth neither requested nor indicated that he would need a part-time schedule or any other type of accommodation. *Id*., at 1450.  In denying the motion for a preliminary injunction, the district court found that Dr. Roth failed to establish that he was an individual with a disability within the meaning of the statutes and that Roth's impairment did not rise to the level of substantially limiting one or more of the major life activities.  *Id*., at 1453.

2.26   After expounding the basics of ADA law, the Court of Appeals concluded that, "[w]hile Dr. Roth's impairment may have affected his major life activities, he has failed to establish that the impairment rises to the level of a disability." *Id*., at 1454. The Court supported that conclusion thus:

The gist of Dr. Roth's allegations are as follows: he is prevented from pursuing his chosen profession as a medical specialty doctor because in order for him to be certified as a specialist in a particular field of medicine, he must successfully complete a post-graduate residency program. He further alleges that because all residency programs require long shifts (such as the 36 hour calls at LGH) and his visual condition prevents him from working for more than eight to ten hours straight, he is substantially limited in performing the major life activities of seeing and learning. As an initial matter, it is not established in this record that each and every pediatric residency program requires 36 hour calls or long shifts. Indeed, the entities responsible for regulating pediatric residency programs, the Accreditation Council for Graduate Medical Education and the American Board of Pediatrics, do not prohibit part-time residency programs, nor do they require "a stipulated number of daily or weekly hours," so long as the part-time resident receives a total of 33 months of training with graduated responsibility. Drawing an analogy to employment cases where the inability to perform either a particular job for a particular employer or a narrow range of jobs is held not to be a disability, we cannot say that an inability to fulfill long shifts or 36 hour call duties ... necessarily proves that Dr. Roth is disabled within the meaning of the Acts.

*Id*., at 1454-1455.

2.27    The Court continued its analysis as follows:

More importantly, no objective medical findings directly support Dr. Roth's assertion that he is so significantly restricted by his visual impairment such that he is incapable of performing night calls. Roth's treating physician, Dr. Parmet, did determine that Dr. Roth's ability to do laboratory work may be limited because of Roth's lack of stereopsis, or limited ability to see objects in three dimensions. Dr. Parmet, however, stated that the condition will not affect Dr. Roth adversely in the practice of medicine if he can avoid tasks such as the use of a binocular microscope requiring the fine perception of depth and other procedures that require good stereopsis. Dr. Parmet further noted that while Roth's condition is not completely correctable through the use of glasses or other means, Roth has "adapted well to daily activities and he should have the visual capacity to function well in most medical specialties." As to Dr. Roth's visual endurance, Dr. Parmet testified at the hearing that Roth had complained of occasional double vision, eye strain, fatigue, difficulty focusing and headaches, all of which symptoms are consistent with Roth's visual condition. Dr. Parmet stated, however, that Roth's condition, which was congenital, has remained stable at least in the five years he had consulted with him professionally. Although Dr. Parmet opined that Dr. Roth becomes visually fatigued faster than an individual not suffering from strabismus, Parmet testified that it is not possible to objectively measure the extent of a patient's eye fatigue, or to quantify the rate at which one develops eye strain. Thus, Dr. Parmet stated that he was not in a

position to determine whether or not Dr. Roth was physically able to perform satisfactorily a 36 hour shift while suffering from strabismus. As to whether Roth could function successfully in any residency program without accommodation, Dr. Parmet testified that he would not be able to render an opinion without relying primarily on Dr. Roth's own statements as to what he can or cannot do and what his limitations are. The question, then, becomes one of Dr. Roth's credibility.

*Id*., at 1455.

2.28    Plaintiff doctor Roth claimed that him not being admitted to the residency program was disability discrimination. As to that averment, the Court found that he "failed to rebut LGH's legitimate, non-discriminatory reason for its ranking decision." *Id*. The Court elaborated, observing that the decisionmakers were consistently put down by what they perceived as Roth's arrogance and other "personality shortcomings."  For instance a doctor Hetland "wrote in the evaluation that Roth was 'the most insolent and arrogant resident applicant that [he] had ever interviewed,' and that he 'cannot imagine working with Mr. Roth in a supervisorial role.'" *Id*., at 1458. Added the Court:

> Indeed, the committee's consideration of, and emphasis on, Roth's non-academic qualifications or lack thereof was certainly legitimate in the determination of Roth's fitness as a resident. Under the directive of the American Medical Association, residency programs should "select from among eligible applicants on the basis of their preparedness and ability to benefit from the program" by considering the applicant's "aptitude, academic credentials, personal characteristics, and ability to communicate . . ." *See* Graduate Medical Education Directory 1993-1994, p. 15 (1993) ... Moreover, the idea that a resident must have good interpersonal and communication skills so as to adequately meet patient needs is evident in the requirements for accreditation of residency programs as set forth by the American Medical Association. ... Dr. Roth has failed utterly to rebut LGH's valid, nondiscriminatory reasons of his character flaws, and thus, he has failed to meet the threshold burden of demonstrating some likelihood of success on his discrimination claim. *See* Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n, 35 F.3d 1134, 1137 (7th Cir. 1994) ("As a threshold matter, the moving party must establish that it has some likelihood of success on the merits.").

*Id*., at 1458-1459.

2.29    **Third**, there is <u>Wynne</u> v. <u>Tufts Univ. Sch. of Med.</u>, 976 F.2d 791 (1st Cir. 1992), where plaintiff claimed that Tufts Medical School had to accommodate him by allowing him to take tests that were not of the multiple-choice kind. The Court of Appeals for the First Circuit stated that "[i]n the section 504 milieu, an academic institution can be expected to respond only to what it knows (or is chargeable with knowing). This means, as the Third Circuit has recently observed, that for a medical school 'to be liable under the Rehabilitation Act, [it] must know or be reasonably expected to know of [a student's] handicap.' <u>Nathanson</u> v. <u>Medical College of Pa.</u>, 926 F.2d 1368, 1381 (3d Cir. 1991). A relevant aspect of this inquiry is whether the student ever put the medical school on notice of his handicap by making '**a sufficiently direct and specific request for special accommodations**.' *Id*. at 1386. Thus, we must view the reasonableness of Tufts' accommodations against the backdrop of what Tufts knew about Wynne's needs while he was enrolled there." <u>Wynne</u>, 976 F.2d, at 795.

2.30    Part of the analysis of the Court is worth citing: "Several factors are entitled to weight in this equation, including the following: (a) Wynne was never diagnosed as dyslexic while enrolled at Tufts; (b) the school gave him a number of special dispensations and 'second chances' — including virtually every accommodation that he seasonably suggested; © Wynne had taken, and passed, multiple-choice examinations in several courses; and (d) he never requested, at any time prior to taking and failing the third biochemistry exam, that an oral rendering be substituted for the standard version of the multiple-choice test. Under these circumstances, we do not believe a rational fact finder could conclude that Tufts' efforts at accommodation fell short of the reasonableness standard." Id., at 795-796.

2.31     **Finally**, in <u>Burch</u> v. <u>Coca-Cola, Co.</u>, 119 F.3d 305, 314 (5th Cir. 1997), the Court sensibly and correctly asserted: "The ADA, its implementing regulations, and the EEOC's interpretive guidance make clear that an employer's obligation to provide a 'reasonable accommodation,' when triggered, contemplates changes to an employer's procedures, facilities, or performance requirements that will permit a qualified individual with a disability to perform the essential functions of his or her job. In all cases a reasonable accommodation will involve a change in the *status quo*, for it is the *status quo* that presents the very obstacle that the ADA's reasonable accommodation provision attempts to address."

2.32     The Court further held that "this case was improperly tried on a reasonable accommodation theory. First, Burch failed to establish that his alcoholism interfered in any way with his ability to perform the essential functions of an area service manager for Coca-Cola without reasonable accommodation or, for that matter, that his alcoholism ever substantially impaired any major life activity. Second, Burch **failed to establish that he ever requested any modification or adjustment to his job** as an area service manager with Coca-Cola. A wrongful termination claim under the ADA is not properly analyzed under a reasonable accommodation theory unless an employer is shown to have terminated a qualified individual with a disability in order to avoid accommodating that employee's impairments at the workplace. Accordingly, **an employee who requests only the opportunity to return to an unmodified, previously-held position fails to state a cognizable claim** under 42 U.S.C. §(s) 12112(b)(5)." ***Id***. (Emphasis supplied).

2.33     The complaint in the present case is plagued with conclusions, but with no facts to support those conclusions. *See* ¶ 1.4 of the present Motion, *supra*, which summarizes Quiñones' averments under the ADA. Plaintiff conclusively avers that defendants discriminated against her on

the basis of an alleged disability, rather than merely failing to make an accommodation. In Toledo v. Sánchez, *supra*, the Court of Appeals for the First Circuit held that a plaintiff claiming disability-based discrimination under the ADA "must allege that these decisions were irrational and not motivated by any conceivable legitimate reason." 454 F.3d, at 33. Of course, a plaintiff must allege facts that would plausibly support such element of a ADA discrimination claim, which plaintiff in the instant litigation fails to do.

2.34    Another shortcoming of the complaint has to do with the alleged "reasonable accommodation" that plaintiff has requested and continues to demand: That she be re-admitted to the Ophthalmology Residency Program of the U.P.R. School of Medicine. First, even reading the complaint generously, plaintiff has failed to allege that the University's failure to "accommodate" her situation was due to irrational prejudice and, indeed, rational bases for the actions are apparent from the face of the complaint, as plaintiff avers in her complaint that "As a rehabilitated alcoholic and being in active addiction to Adderall, Soma and Ambien [Quiñones] began to have problems complying with certain requirements of the residency program." ***Complaint***, ¶ 29.

2.35    Moreover, the complaint does not allege that her initial admission to the Program, back in July, 2011, included some sort of accommodation due to she having a "condition" or a "disability." There is no averment, for instance, claiming that she had made clear that she suffered a disability; or that she mentioned in her application to the Program that she had a condition or disability; or that she stated prior to her admission or even after her admission, that her working or training conditions at the Residency Program had to be somehow altered due to a condition or a disability. Neither does plaintiff claim that her readmission to the Program would have to entail

certain accommodations, alterations or concessions that are not normally allowed to medical doctors who train as Ophthalmology residents.

2.36    Mere conclusory allegations of discrimination unsupported by any facts are insufficient for notice pleading purposes. *See* Educadores Puertorriqueños en Acción v. Hernández, *supra*, 367 F.3d at 68. That is, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, *supra*, 556 U.S., at 678. Once the mere conclusions and formulaic allegations are discarded, the averments that qualify as factual allegations must state a plausible claim for relief. Otherwise, dismissal is the only appropriate result. In short, courts must require plaintiffs to allege in their complaints "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, *supra*, 550 U.S. at 570. That is, plaintiffs have to nudge "their claims across the line from conceivable to plausible." *Id*.

2.37    The complaint in the instant case is a mirage, as it lacks factual averments that would state a plausible claim under ADA's Title II and the Rehabilitation Act. Plaintiff's conclusory statements cannot provide the basis for a viable claim. For instance, simply averring that she is disabled and that her disability is substantial enough to affect the major life activity of learning, or any other, is not enough in absence of facts to support that kind of allegation. The inferences that a generous reading of the complaint would cannot possibly include the essential elements of an action under either Title I or Title II of the ADA.  The scenario that the complaint paints is of a physician who ha sno history or learning disabilities, to the point that she became a medical doctor with no need of accommodations, who never requested special treatment in her applicaiton to the residency, and who by simply requesting to simply be readmitted to the Ophthalmlogy residency belies her

averment that she requires the protection of the ADA. Consequently, Defendants pray this Court to dismiss such claims.

C. **THE RETALIATION CLAIM FAILS AS A MATTER OF LAW. THE COMPLAINT DOES NOT AVER FACTS THAT COULD ESTABLISH THAT THE UNDERLYING CONDUCT WAS VIOLATIVE OF THE ADA. NOT ONLY THE UNDERLYING CONDUCT IS NOT DISABILITY DISCRIMINATION, BUT NO REASONABLE PERSON CAN DEEM IT AS SUCH. THUS, THE COMPLAINT FAILS TO STATE A PLAUSIBLE ACTION OF RETALIATION UNDER THE ADA.**

2.38    **Title V** of the ADA contains the Act's anti-retaliation provision. In Collazo–Rosado, *supra*, this District Court held that such "retaliation provision states that, in order for the remedies provided to be available, the claim must arise as a result of a violation of one of the three previous chapters, Title I, II, or III. Therefore ..., a retaliation claim may not arise on its own, wholly independent of an underlying cause of action.... All ADA retaliation claims (Title V) must arise from an alleged violation of Title I, Title II, or Title III." 775 F.Supp.2d, at 384.

2.39    The Supreme Court has held in the Title VII context that a retaliation claim could only prosper if a reasonable person could have deemed the conduct she opposed as unlawful discrimination under Title VII. As it is well known, Title VII of the Civil Rights Act of 1964 prohibits employers from engaging in any retaliatory conduct against an employee or employment applicant who either participates in any way in a Title VII proceeding or who opposes any practice which is made unlawful by Title VII. *See* Section 704 of Title VII, which deems it an "unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this [Act], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [Act]." 42 U.S.C. § 2000e-3(a).

22

2.40    Hence, that clause (known as the "opposition clause") forbids an employer from taking adverse action against an employee or applicant for employment for opposing any conduct made an unlawful employment practice by the Title VII itself. The opposition clause has been broadly construed to protect employees from adverse employment decisions taken because they oppose discriminatory work policies or hiring policies of the employer.

2.41    In Clark County School Dist. v. Breeden, 532 U.S. 268 (2001), the Supreme Court found that an "opposition" was unprotected, because no reasonable person could have believed that the single incident in question constituted actionable harassment. In Breeden, a supervisor read aloud from a job application that the applicant had once commented to a coworker "I hear making love to you is like making love to the Grand Canyon" and then told the plaintiff that he did not understand what that meant while a fellow male employee chuckled. The incident could not support a retaliation claim, and the court of appeals erred in determining that the evidence was sufficient to withstand the employer's motion for summary judgment. The Supreme Court concluded that "**[n]o reasonable person could have believed that the single incident recounted above violated Title VII's standard**," 532 U.S., at 271; and ordered the dismissal of the complaint. (Emphasis added.)

2.42    In Morales-Cruz v. University of Puerto Rico, 676 F.3d 220, 226-227 (1st Cir. 2012), the Court, in affirming a 12(b)(6) dismissal of a retaliation claim, also held that in order to allege retaliation under Section 704's opposition provision, the employee must have a reasonable belief that the employer's challenged actions violated Title VII. 676 F.3d at 226. The complaint averred that law school officials made gender stereotyped comments while opposing plaintiff's request for tenured professorship at the UPR Law School. She also alleged that she was retaliated against for writing to the Chancellor to complain about the "discriminatory" comments made in the course of

23

her request for an extension to her probationary period review. In support of this allegation, she pointed out that after she sent her letter, the Dean reversed his previous sympathetic position on her extension request. 676 F.3d at 226. The Court stated: "This construct suffers from a fatal flaw: her factual allegations do not support a reasonable inference that she was engaging in protected conduct when she opposed the remarks made." *Id*.

2.43    In <u>Morales</u>, plaintiff also alleged that various officials described her as "fragile," "immature," "unable to handle complex and sensitive issues," that she engaged in "twisting the truth," and that she exhibited "lack of judgment." 676 F.3d at 225. Wrote the Court: "These descriptors are admittedly unflattering—but they are without exception gender-neutral. All of them apply equally to persons of either gender and ... they do not support a reasonable inference that the defendants denied the plaintiff an extension of her probationary period because of failed gender stereotype expectations. By definition, terms that convey only gender-neutral meanings are insufficient to anchor a gender-stereotyping claim." *Id*.

2.44    For those same reasons, the Court concluded that "the facts alleged in the amended complaint provide no reasonable basis for inferring that the comments cited reflected gender-based discrimination." 676 F.3d at 226. Hence, those comments "were unarguably gender-neutral and **do not afford an objectively reasonable foundation for a retaliation action**. It follows inexorably that the amended complaint **fails to set forth a plausible claim of retaliation**." *Id*. (Emphasis added).

2.45    **Likewise, in the instant case plaintiff's complaint does not provide a reasonable basis for inferring that the conduct about which she complained was employment discrimination forbidden by Title I or Title II of the ADA** That is, defendants' "opposition" -as

described in the complaint- that is, the alleged complaining of the actions and conduct of defendants, cannot support a finding that her allegations show that she had a reasonable belief that the conduct described by her was unlawful. As already discussed, *ante*, the averments of the complaint do not state a plausible ADA discrimination claim. For the same reasons, it fails to state a plausible retaliation claim under Title V of the ADA. That is, it does "not afford an objectively reasonable foundation for a retaliation action." Morales, *supra*, 676 F.3d at 226.

## III. CONCLUSION AND PRAYER

Plaintiff's action should be dismissed as a matter of law. The complaint fails to state a minimally plausible claim upon which a relief could be granted.

**WHEREFORE**, Defendants request the Court to dismiss the complaint, with prejudice.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, on August 29, 2014.

**WE HEREBY CERTIFY** that on this date, we have electronically filed the foregoing Motion to Dismiss with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

GONZALEZ CASTAÑER, CSP
128 F.D. Roosevelt Ave., 2nd Floor
San Juan, Puerto Rico 00918-2409
Tel. 787-758-7819/ Fax 787-758-4152

*s/ Roberto A. Fernández Quiles*
**ROBERTO A. FERNANDEZ QUILES, Esq.**
**USDC-PR No. 206301**
rfernandez@gcpsc.com
rafernandezlaw@gmail.com

*s/ Magaly Rodríguez Quiñones*
**MAGALY RODRIGUEZ QUIÑONES**
USDC-PR No. 205010
mrqvlaw@gmail.com
mrodriguez@gcpsc.com