IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| KARINA QUINONES, M.D., | |
| Plaintiff, | |
| v. | CIVIL NO. 14-1331 (JAG) |
| UNIVERSITY OF PUERTO RICO, *et al.*, | |
| Defendants. | |

OPINION AND ORDER

GARCIA-GREGORY, D.J.

Pending before the Court is a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) filed on August 29, 2014 by the University of Puerto Rico ("UPR"), Uroyoan Walker-Ramos, Dr. Edgar Colon-Negron, Dr. Pedro J. Santiago-Borrero, and Dr. Luis Serrano-Torres, all in their official capacities (collectively "Defendants"). Docket No. 40. For the reasons outlined below, Defendant's Motion to Dismiss is hereby GRANTED in part and DENIED in part.

BACKGROUND

Dr. Karina Quinones ("Dr. Quinones" or "Plaintiff") is a licensed physician in Puerto Rico. Docket No. 1 at ¶ 9. Prior to her admission and enrollment in the Ophthalmology Residency Program ("Residency Program") of the UPR School of Medicine, Dr. Quinones enrolled herself in an alcohol rehabilitation program on March 2011 to treat her alcoholism. Docket No. 1 at ¶ 26. She was then released from the rehabilitation facility with a number of prescriptions, which she began to use in a manner not prescribed by her physician on or about

July 2011. Id. at ¶ 27. That same month, she was admitted and enrolled in the Residency Program. Id. at ¶ 25.

Once enrolled, Dr. Quinones developed an addiction to Soma, Ambien, and Adderall, which had been prescribed by her psychiatrist to improve her focus during her training. Id. at ¶ 27. Specifically, her addiction to Adderall caused her visual disturbances, speech problems, and dizziness. Id. at ¶ 28. As a result of her active addiction to these prescription drugs, Plaintiff began to have problems in complying with certain requirements of the Residency Program. Id. at ¶ 29. In light of these problems, Dr. Quinones met several times with the Residency Program committee to discuss her drug addiction and how it was affecting her performance. . Id. at ¶ 30.

On September 10, 2012, Plaintiff was terminated from the Residency Program. Days later, on September 27, Dr. Quinones filed a suit in the Superior Court of Puerto Rico for preliminary and permanent injunctive relief against UPR, requesting her immediate reinstatement to the Residency Program. Id. at ¶ 31. Subsequently, both parties reached an agreement on October 9, 2012, in which the Residency Program agreed to temporarily leave without effect the decision to terminate Dr. Quinones and grant her an opportunity to formally request reasonable accommodation, which would then be evaluated after a hearing by the School Institutional Committee on Federal Laws ("Committee on Federal Laws"). Id. at ¶ 31. In exchange, Plaintiff agreed to dismiss her lawsuit without prejudice. Id. at ¶ 33.

On November 30, 2012, after Dr. Quinones complied with submitting the reasonable accommodation request, hearings were held in which the Plaintiff testified before the Committee on Federal Laws and submitted medical and testimonial evidence of her rehabilitation. Id. at ¶¶ 34-35. The evidence submitted showed that: (1) she had been free from

using alcohol since March 5, 2011; (2) she had been free for six months from taking prescription drugs; and (3) she was actively participating in Alcoholics Anonymous and Narcotic Anonymous meetings. Id. at ¶¶ 36, 41. On April 29, 2013, the Committee on Federal Laws rejected Plaintiff's request for permanent reinstatement because: (1) she could not comply with the essential functions of her position; (2) she had a high risk of relapse; and (3) she would require constant supervision of a faculty member and to provide this supervision would constitute an undue hardship for the Residency Program. Id. at ¶ 38.

On April 22, 2014, Plaintiff filed the Complaint at bar asserting claims of disability discrimination and retaliation under the American Disabilities Act, 42 US.C. §§ 12101 et. seq. ("ADA") and the Federal Rehabilitation Act of 1973, 29 U.S.C. §§ 701, 705 (20)(B) ("Rehabilitation Act"), and alleging violations of the Civil Rights Act, 42 U.S.C. §1983. Docket No. 1. Plaintiff also included state law claims under the Puerto Rico Anti-Discrimination statute, Act No. 44 of July 2, 1985, 1 LPRA § 501 et. seq. and Articles 1802 and 1803 of the Puerto Rico Civil Code, 31 LPRA §§ 5141-5142. Id. Subsequently, on August 29, 2014, Defendants filed the instant Motion to Dismiss for failure to state a claim. Docket No. 40. After carefully reviewing both parties' filings with respect to the Motion to Dismiss, this Court found the briefs to be quite repetitive and poorly organized and, thus, ordered the parties to file supplemental briefs on a number of specific issues. Docket No. 49. The parties complied and filed their supplemental briefs. Docket Nos. 50, 52.

## STANDARD OF REVIEW

To survive dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a complaint must allege "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1967

(2007). According to <u>Twombly</u>, the complaint must state enough facts to "nudge [plaintiff's] claims across the line from conceivable to plausible." <u>Id.</u> at 1974. Therefore, to preclude dismissal pursuant to Fed. R. Civ. P. 12(b)(6), the complaint must rest on factual allegations sufficient "to raise a right to relief above the speculative level." <u>Id.</u> at 1965.

At the motion to dismiss stage, courts accept all well-pleaded factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. <u>See Correa-Martinez v. Arrillaga-Belendez</u>, 903 F.2d 49, 51 (1st Cir. 1990). Thus, the plaintiff bears the burden of stating factual allegations regarding each element necessary to sustain recovery under some actionable theory. <u>Goolev v. Mobil Oil Corp.</u>, 851 F.2d 513, 514 (1st Cir. 1988). Courts need not address complaints supported only by "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like." <u>Aulson v. Blanchard</u>, 83 F.3d 1, 3 (1st Cir. 1996).

## ANALYSIS

I.   **American with Disabilities Act**

   A.   **Exhaustion of Administrative Remedies**

The requirement to exhaust administrative remedies with the Equal Employment Opportunity Commission ("EEOC") prior to filing an action alleging discrimination only applies to those claims made under Title I of the ADA. <u>See Bonilla v. Muebles J.J. Alvarez, Inc.</u>, 194 F.3d 275, 277 (1st Cir. 1999) ("[T]he ADA mandates compliance with the administrative procedures specified in Title VII, and that, absent special circumstances, such compliance must occur before a federal court may entertain a suit that seeks recovery for an alleged violation of Title I of the ADA."). This exhaustion requirement, however, does not apply to claims under Title II of the

ADA. <u>See e.g.</u>, <u>Rivera-Concepcion v. Puerto Rico</u>, 682 F. Supp. 2d 164 (D.P.R. 2010); <u>Mitchell v. Mass. Dep't of Corrections</u>, 190 F. Supp. 2d 204, 209 (D. Mass. 2002) (summarizing case law regarding the absence of an administrative exhaustion requirement under Title II of the ADA). In this sense, Title II of the ADA follows the administrative procedures of the Rehabilitation Act, which does not require exhaustion. <u>See</u> <u>Brennan v. King</u>, 139 F.3d 258, 268 n.12 (1st Cir. 1998).

Since the claims in the instant case arise under Title II of ADA and the Rehabilitation Act, this Court finds that Plaintiff was not required to file an EEOC charge before filing the Complaint.[1]

### B.  Disability Discrimination Claims

The ADA "prohibit[s] discrimination against an otherwise qualified individual based on his or her disability." 42 U.S.C. § 12112(a); <u>see</u> <u>Calero-Cerezo v. U.S. Dep't of Justice</u>, 355 F.3d 6, 19-20 (1st Cir. 2004). To establish a claim under the ADA at this stage, Plaintiff must allege facts showing that: (1) she was a disabled individual within the meaning of the ADA; (2) she was qualified to perform the essential functions of the job, either with or without reasonable accommodations; and (3) Defendants took adverse action against her because of her disability. <u>Bailey v. Georgia-Pacific Corp.</u>, 306 F.3d 1162, 1166 (1st Cir. 2002).

---

[1] At all times in the Motion to Dismiss, Defendants concede that Plaintiff's claims arise under Title II of the ADA. Docket No. 40. Inexplicably, Defendants proceed to directly contradict themselves in their supplemental brief by claiming that Plaintiff's claims arise under Title I because she is an employee of the UPR. Docket No. 50. This statement is not only unsound, but also disingenuous. Since Title II covers programs and services of public entities, such as the UPR, it clearly follows that Plaintiff's claims arise under such title. <u>See</u> 42 U.S.C. § 12131 <em>et seq.</em>

1.   **ADA's Disability Analysis**

The ADA defines disability as: (A) a physical or mental impairment that substantially limits one or more major life activities; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102. To survive Defendants' Motion to Dismiss, Plaintiff must allege sufficient facts showing that her underlying conditions of alcoholism and illegal drug use are physical or mental impairments that substantially limit one of her major life activities.[2]

The Court finds that Plaintiff has met this burden only as to the illegal use of drugs.  It is true that both alcoholism and drug use are considered impairments for purposes of the definition of disability. Bailey, 306 F.3d at 1167 (citing H.R. Rep. No. 101-485(II), at 51 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 333 (noting that "physical and mental impairment" includes "drug addiction and alcoholism")). As to her alcoholism, however, she clearly states in the Complaint that she is a "rehabilitated alcoholic" that was released from an alcohol rehabilitation program prior to her enrollment into the Residency Program. Docket No. 1 at ¶ 29. In fact, Plaintiff failed to allege any instances in which her former consumption of alcohol limited any of her major life activities during her residency training. It follows from her status as a "rehabilitated alcoholic" that she cannot be considered a disabled individual within the meaning of the ADA. See Lessard v. Osram Sylvania, Inc., 175 F.3d 193, 197 (1st Cir. 1999) (holding that impairments do not automatically lead to ADA protection if there is no evidence of a substantial limitation of one or more major life activities).

---

[2] Plaintiff does not allege that Defendants regarded her as an alcoholic or an addict. Instead, she claims that as a rehabilitated alcoholic and an active drug addict at the time of her residency training, she was a disabled individual when Defendants terminated her. Docket No. 1 at ¶¶29-30.

Plaintiff, however, alleges sufficient facts to show that her illegal drug use substantially limited one or more of her major life activities. First, it is worth recognizing "that the illegal use of drugs includes the unlawful use of legal prescription drugs." 29 C.F.R. Part 1630, App. § 1630.3. Second, Plaintiff acknowledges that while "in *active addiction* to Adderall, Soma, and Ambien, [she] began to have problems in complying with certain requirements of the residency program." Docket No. 1 at ¶ 29 (emphasis added). Plaintiff alleges that she suffered from visual disturbances, speech problems, and dizziness that affected her work, concentration, school attendance, learning, and social interactions. Id. at ¶¶ 11, 28-29. The Court finds that these allegations are sufficient at this stage to show that her drug addiction limited major life activities. See 29 C.F.R. ¶ 1630.2(i) (stating that major life activities include "seeing . . . learning, reading, concentrating, thinking, communicating, interacting with others, and working").

Notwithstanding, Plaintiff's statement in the Complaint that —as an *active addict* to prescription drugs she "began to have problems in complying with certain requirements of the residency program"— is fatal to her claim. Docket No. 1 at ¶ 29. The ADA clearly provides that an employee is not a "qualified individual with a disability" if that person "is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." 42 U.S.C. § 12114(a); see also Jones v. City of Boston, 752 F.3d 38, 58 (1st Cir. 2014). That is the case here. Plaintiff alleges in the Complaint that she was currently engaging in the illegal use of drugs during her residency training and that, shortly thereafter, she was terminated after several internal meetings with the residency program committee. Docket No. 1 at ¶¶ 29-30. In light of

this admission, the Court holds that Plaintiff is not entitled to ADA protection and, thus, failed to state a claim under the statute.[3]

Plaintiff seems to recognize how damning this admission is when she switches gears in her supplemental brief to argue instead that she is entitled to ADA protection as a "recovering addict." Docket No. 52 at 3. The Court rejects Plaintiff's untimely allegation for various reasons. It is true that the ADA protects "[i]ndividuals who are recovering from an addiction to drugs, . . . as the statute aims to protect them from the stigma associated with their addiction." Jones, 752 F.3d at 58. It does so by creating a "safe harbor" that extends ADA coverage to an individual who:

> (1)     has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use;
> (2)     is participating in a supervised rehabilitation program and is no longer engaging in such use; or
> (3)     is erroneously regarded as engaging in such use, but is not engaging in such use . . . .

42 U.S.C. § 12114(b). In other words, this provision applies to individuals who are not "currently engaging in the illegal use of drugs." 42 U.S.C. § 12114(a)-(b).

_____

[3] Plaintiff argues that Defendants are unable to claim now that she was not a qualified disabled individual because, according to the Complaint, they made a party admission when they agreed to evaluate her request for reasonable accommodation. Docket No. 52 at 5 (citing Docket No. 1 at ¶38). Plaintiff further argues that the Court must be mindful of this alleged admission and, thus, should not delve into the ADA's disability analysis. Id. The Court disagrees. In fact, the alleged admission cannot be reconciled with Plaintiff's allegation that Defendants found her to be unable to "comply with the essential functions of the Ophtalmology Residency Program" and that she "had a high risk of relapse." Docket No. 1 at ¶38. If the Court takes these allegations as true, as required at this stage, Defendant could not have possibly admitted to Plaintiff being a qualified individual. Consequently, Plaintiff's allegation that Defendants considered her a qualified individual with a disability under federal law is a conclusion of law not entitled to any deference and unsupported by the very facts alleged in the Complaint.

Courts that have considered the scope of the words "currently engaging in the illegal use of drugs" have refused to establish a bright line for determining when an individual is "currently" using drugs. Instead, courts have made this determination on a "case-by-case" basis. See e.g., Mauerhan v. Wagner Corp., 649 F.3d 1180, 1187 (10th Cir. 2011) ("[U]nder the ADA, . . . an individual is currently engaging in the illegal use of drugs if the drug use was sufficiently recent to justify the employer's reasonable belief that the drug abuse remained an ongoing problem.") (internal quotation marks omitted); Brown v. Lucky Stores, Inc., 246 F.3d 1182 (9th Cir. 2001) ("[T]he 'safe harbor' provision applies only to employees who have refrained from using drugs for a significant period of time."); Zenor v. El Paso Healthcare Sys., Ltd., 176 F.3d 847, 856 (5th Cir. 1999) ("Under the ADA, 'currently' means that the drug use was sufficiently recent to justify the employer's reasonable belief that the drug abuse remained an ongoing problem."); Shafer v. Preston Mem'l Hosp. Corp., 107 F.3d 274, 278 (4th Cir. 1997), abrogated on other grounds by Baird ex rel. Baird v. Rose, 192 F.3d 462 (4th Cir. 1999) ("'[C]urrently' means a periodic or ongoing activity in which a person engages . . . that has not permanently ended . . . .").[4] These interpretations coincide with the regulations interpreting § 12114(a). 29 C.F.R. § 1630.3 (explaining that the term "currently engaging" applies "to the illegal use of drugs that has occurred recently enough to indicate that the individual is actively engaged in such conduct").

It follows that courts unanimously agree that the words "currently engaging" in the ADA's "safe harbor" provision essentially mean that the illegal use of drugs remains an ongoing

---

[4] While the First Circuit has not specifically addressed the meaning of the words "currently engaging," these cases show that courts unanimously agree that the text and legislative history of ADA indicate that a person that has been drug-free for weeks or months prior to discharge may still not be a "qualified individual with a disability" for purposes of the statute. See Shafer, 107 F.3d at 278.

problem. The courts also agree that a significant period of time must pass for an individual to not be considered a current user. This is because this "safe harbor" provision "exclude[s] from statutory protection an employee who illegally uses drugs *during the weeks and months* prior to her discharge, even if the employee is participating in a drug rehabilitation program and is drug-free on the day she is fired." Shafer, 107 F.3d at 279 (emphasis added) (holding that a nurse who diverted drugs from her hospital employer for her personal use one month prior to her termination was not entitled to ADA protection even if she was participating in a rehabilitation program and was drug-free at the time of the termination).

Moreover, it is clear from both the text of the ADA and its legislative history that Congress intended to treat drug addiction differently from other impairments and disabilities by allowing employers not to go through the reasonable accommodation process and, instead, terminate their employees on the basis of their drug use and drug-related misconduct. See e.g., 42 U.S.C. § 12114(a) (excluding active addicts from ADA protection); H.R. Rep. No. 101-596, at 69, 1990 U.S.C.C.A.N. 565, 578 (1990) (Conf. Rep.) (emphasizing that the ADA's exclusion of individuals who engage in the illegal use of drugs applies to persons whose illegal use "occurred recently enough to justify a reasonable belief that a person's drug use is current"); see also Salley v. Circuit City Stores, Inc., 160 F.3d 977 (3d Cir. 1998) (explaining Congress's intent in treating active drug addicts differently for purposes of the ADA).

In light of this framework, the main question that this Court faces at this stage is whether the allegations in the Complaint indicate that Plaintiff abstained from drug use for enough time to fall under the ADA's protections. The Court finds that Plaintiff's allegations do not support such a conclusion for various reasons. First, Plaintiff claims that she stopped the

illegal use of prescription drugs at some point in late May 2012. Docket No. 1 at ¶¶ 35-36.[5]
Second, the Complaint indicates that Plaintiff was terminated from the Residency Program on
September 10, 2012, which was little over three months from when Plaintiff stopped using drugs.
Id. at ¶ 35. Third, Plaintiff alleges that Defendants only became aware of her addiction after
several internal meetings and hearings with Plaintiff as a result of her problems complying with
the Residency Program's requirements. Id. at ¶ 29-30.

        The fact that Plaintiff was drug-free at the time of her termination is irrelevant if the
Complaint fails to indicate that she refrained from drug use for a sufficiently long period of time
so as to fall under the ADA's safe harbor provision. See e.g., Vedernikov, M.D. v. West Virginia
Univ., 55 F. Supp. 2d 518, 522-523 (N.D.W. Va. 1999) (holding that an Anesthesiology Resident
was not entitled to ADA protection even though he was drug-free at the time of his admission to
the Residency Program and at the time of his termination two months later); Baustian v. State of
La., 910 F. Supp. 274, 277 (E.D. La. 1996) (dismissing plaintiff's ADA claim on the basis that
"[s]even weeks simply does not satisfy the statute's requirement of long term abstinence from
illegal drug use"); McDaniel v. Mississippi Baptist Medical Center, 877 F. Supp. 321, 328 (S.D.
Miss. 1995) (concluding that being drug-free for merely six weeks did not satisfy the
requirements of the safe harbor provision). In fact, "under the plain meaning of the [ADA and
Rehabilitation Act] statutes, an employee illegally using drugs in a periodic fashion during *weeks
or months* prior to discharge is currently engaging in the illegal use of drugs." Shafer, 107 F.3d at

---

[5] Interestingly, Plaintiff does not provide the exact date of when she stopped using the prescription
drugs. Instead, Plaintiff claims that she testified at the November 30, 2012 hearing before the Committee
on Federal Laws that she had been free for six months from using Adderall, Soma, and Ambien. Docket
No. 1 at ¶¶35-36. As a result, this Court finds that Plaintiff must have abstained from drug use at some
point in late May 2012.

278-279 (internal quotation marks omitted) (stating that "the legislative history makes plain that Congress's intent that the broader meaning of 'currently' apply"). In the instant case, being drug-free for a little over three months is not a sufficiently long enough period of time to be classified as a recovering drug user. In terms of timing, this case is more like Vedernikov and Baustian, than United States v. Southern Mgm't Corp., 955 F.2d 914 (4th Cir. 1992), where the court held that one year abstinence is not considered current drug use.

Furthermore, Plaintiff alleges in the Complaint that, at least as of November 30, 2012, she was actively participating in Narcotic Anonymous meetings and receiving psychiatric and addiction counseling treatment. Docket No. 1 at ¶¶ 35-36. Assuming *arguendo* that the meetings and psychiatric treatment qualify as a drug rehabilitation program, it is well established that "the mere fact that an employee has entered a rehabilitation program does not automatically bring that employee within the safe harbor's protection." Zenor, 176 F.3d at 857 (citing McDaniel, 877 F. Supp. at 327-28; Shafer, 107 F.3d at 278); see also Brown, 246 F.3d at 1188 ("Mere participation in a rehabilitation program is not enough to trigger the protections of 42 U.S.C. § 12114(b)(2) . . . ."). In addition, Plaintiff fails to allege when exactly she started attending these meetings and receiving the treatment. In any event, regardless of when she began the rehabilitation process, Plaintiff cannot insulate herself "from disciplinary action or termination" by "enrolling in and participating in a drug rehabilitation program . . . ." Bautista, 910 F. Supp. at 276. Finally, since the safe harbor provision applies to a long term recovery program and long term abstinence from drug use, it necessarily follows from the Complaint that Plaintiff cannot be considered a disabled individual under the ADA because she was "currently engaging in the illegal use of drugs" when she was terminated. 42 U.S.C. § 12114.

The Court's holding today becomes even more forceful after considering Plaintiff's responsibilities as an ophthalmology resident and the effects that her drug addiction had on her ability to comply with the requirements of the Residency Program. See Mauerhan, 649 F.3d at 1188 (quoting Zenor, 176 F.3d at 856-857) (other citations omitted) (stating that, in addition to the timing of the employee's drug use, a court may examine "the level of responsibility entrusted to the employee; the employer's applicable job and performance requirements; the level of competence ordinarily required to adequately perform the task in question; and the employee's past performance record"). Like the pharmacist in Zenor, Plaintiff's position "required a great deal of care and skill," since "any mistakes could gravely injure [Plaintiff's] patients." Zenor, 176 F.3d at 857. Therefore, in light of the short period of abstinence preceding her termination and the level of responsibility entrusted to her, it was reasonable for Defendants to conclude that Plaintiff was currently engaging in the illegal use of drugs. See Zenor, 176 F.3d at 857 ("[A] short period of abstinence, particularly following such a severe drug problem, does not remove from the employer's mind a reasonable belief that the drug use remains a problem.").

Finally, the April 29, 2013 decision rejecting Plaintiff's reasonable accommodation request —the request for reinstatement— did not violate ADA because the statute did not require Defendants to reinstate Plaintiff as a resident if Plaintiff was lawfully discharged in the first place. See Flynn v. Raytheon Co., 94 F.3d 640 (1st Cir. 1996) ("The ADA does not require an employer to rehire a former employee who was lawfully discharged for repeated disability-related failures to meet its legitimate job requirements."). Furthermore, since Congress intended to treat drug addiction differently from other impairments and disabilities by allowing employers not to go through the reasonable accommodation process, Plaintiff's request for

permanent reinstatement was the functional equivalent of asking for a second chance. In other words, Plaintiff "confuses a conditional promise to consider a . . . request to rehire with a putative ADA-based obligation to rehire at present." Id. Thus, since Plaintiff was lawfully discharged on the basis of her illegal use of drugs, "the ADA did not require the employer to afford him another chance." Id. (citing Siefken v. Village of Arlington Heights, 65 F.3d 664, 666 (7th Cir. 1995)).

In conclusion, Defendants' actions as alleged in the Complaint could not have violated ADA because Plaintiff has failed to aver sufficient facts indicating that she is a disabled individual within the meaning of the statute.

### 2. Qualification Analysis

Even assuming that Plaintiff is a disabled individual, this Court alternatively holds that Plaintiff is not a *qualified* disabled individual within the meaning of the ADA. In addition to the disability analysis, a prevailing plaintiff must show that she is a "qualified" individual. See EEOC v. Amego, Inc., 110 F.3d 135, 141 (1st Cir. 1997); see also 42 U.S.C. § 12111. To do so, the plaintiff must allege sufficient facts showing: "(1) that the employee satisfied the prerequisites for the position, such as experience, education, and other job-related requirements; and (2) that she, with or without reasonable accommodation, can perform the essential functions of such position held or desired." Griel v. Franklin Med. Cen., 71 F. Supp. 2d 1, 8 (D. Mass. 1999) (citing Amego, 110 F.3d at 145 n.7) (other citations omitted). Additionally, whenever the position's essential functions "necessarily implicate the safety of others, plaintiff must demonstrate that she can perform those functions in a way that does not endanger others." Amego, 110 F.3d at 144.

In the instant case, Plaintiff failed to allege that she was qualified to perform the essential functions of her job as an ophthalmology resident.[6] Plaintiff's allegations, instead, show that her use of prescription drugs caused her "visual disturbances, speech problems[,] and dizziness," as well as problems with her ability to concentrate and interact with others. Docket No. 1 at ¶¶ 11, 28. These allegations are fatal to Plaintiff's claim considering that, as an ophthalmology resident, Plaintiff had to constantly interact with patients and was responsible for their eye care and treatment. It is hard to imagine that a person suffering from "visual disturbances" and "dizziness" as a result of an active addiction to prescription drugs is qualified to perform the essential functions of an ophthalmology resident. The Complaint at bar does not support an inference that Plaintiff was qualified to provide adequate eye care and treatment to her patients, let alone perform these job functions without endangering her patients. See Zenor, 176 F.3d at 858 (finding that a pharmacist recently treated for cocaine addiction was unable to perform the position's essential job functions on the basis that "it undermined the integrity of its hospital pharmacy operation").

It is also well established that an employer "may hold an employee who engages in the illegal use of drugs . . . to the same qualification standards for employment or job performance and behavior as such entity holds other employees, *even if unsatisfactory performance or behavior is related to the drug use*" of the employee. 42 U.S.C. § 12114(c)(4) (emphasis added); see also

---

[6] Plaintiff claims in the Complaint that she is a "qualified disabled individual" because "she was capable to comply with the essential residency program requirements" at all relevant times. Docket No. 1 at ¶ 39, 46. This, however, is a bald assertion and an unsupported conclusion of law that is not entitled to deference at this stage, particularly since Plaintiff concedes that she had problems complying with the program's requirements as a result of her active addiction to prescription drugs. See Aulson, 83 F.3d at 3 (stating that "unsupportable conclusions" are not accepted as true for purposes of a motion to dismiss).

Mauerhan, 649 F.3d at 1188 ("[U]nsatisfactory conduct caused by alcoholism and illegal drug use does not receive protection under the ADA or Rehabilitation Act.")  (citation omitted). It follows that Defendants did not have to provide reasonable accommodation if Plaintiff's failure to comply with the Residency Program's requirements resulted from her active addiction to prescription drugs. In any event, Plaintiff fails to show how her alleged request for reasonable accommodation —that is, her request for reinstatement— would have allowed her to perform her job functions properly without endangering others. Therefore, the Complaint does not support a finding that Plaintiff is a "qualified" individual.

       In conclusion, since Plaintiff has failed to allege sufficient facts showing that she is a qualified individual with a disability, it necessarily follows that Plaintiff has failed to state a valid discrimination claim under the ADA.

### C. Retaliation Claim

       To state a valid retaliation claim under Title V of the ADA, Plaintiff must allege sufficient facts showing that: "(1) she engaged in protected conduct; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 106 (1st Cir. 2007). Additionally, it is worth mentioning that an ADA plaintiff may assert a claim for retaliation even if she fails to succeed on a disability claim. See Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 16 (1st Cir. 1997).

       This Court finds that Plaintiff alleges sufficient facts supporting a valid retaliation claim for various reasons. See Docket No. 1 at ¶¶ 52-53. First, not only did she file a lawsuit in state court arguing that Defendants discriminated against her on the basis of her alleged disability,

but also, she filed a request for reasonable accommodation after she agreed to voluntarily dismiss the lawsuit. In this regard, both the filing of the lawsuit in state court and the request for reasonable accommodation constituted protected conduct under the ADA's retaliation provision. See Kelley v. Correctional Medical Servs., Inc., 707 F.3d 108 (1st Cir. 2013) (stating that "[r]equesting an accommodation is protected conduct under the ADA's retaliation provision").

Second, Plaintiff alleges that she suffered an adverse employment action when she was denied reinstatement in the April 29, 2013 decision. Docket No. 1 at ¶ 38 . The Complaint shows that Defendants agreed on October 9, 2012 to "temporarily leave without effect the [September 10, 2012] decision to permanently withdraw" Plaintiff from the Residency Program. Id. at ¶ 32. Since Plaintiff was merely suspended from the Residency Program at the time of the April 29 decision, it follows that she suffered an adverse employment action when Defendants refused to reinstate her and permanently terminated her. Finally, the Court finds that Plaintiffs' allegations regarding the October 9 agreement and the proximity between her protected conduct and the adverse employment action are sufficient to establish a causal link at this preliminary stage. See Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997), cert. denied, 522 U.S. 914 (1997) (stating that "temporal proximity between the protected activity and the termination is sufficient to establish a causal link").

Consequently, this Court holds that Plaintiff has stated a valid retaliation claim under the ADA.

Civil No. 14-1331 (JAG)                                                                     18

## II.   Rehabilitation Act

To state a claim under the Rehabilitation Act, Plaintiff must have alleged sufficient facts showing that: (1) she suffered from a "disability" within the meaning of the statute; (2) she was a qualified individual in that she was able to perform the essential functions of her job, either with or without a reasonable accommodation; and (3) despite her employer's knowledge of her disability, the employer did not offer a reasonable accommodation for the disability. Calero-Cerezo, 355 F.3d at 19-20. Since the Rehabilitation Act and the ADA share, *inter alia*, the definitions of disability and qualification, it follows that the analysis in Part I of this Opinion and Order applies with equal force to Plaintiff's claim under the Rehabilitation Act.  See e.g., Calero-Cerezo, 355 F.3d at 19-20 (stating that "the case law construing the ADA generally pertains equally to claims under the Rehabilitation Act"); Bercovith v. Baldwin School, 133 F.3d 141, 155 (1st Cir. 1998) (stating that the "ADA expressly provides that it be enforced in a manner consistent with the requirements of the Rehabilitation Act").

Consequently, the Court holds that Plaintiff has failed to state a valid claim under the Rehabilitation Act because she is not a qualified individual with a disability.

## III.   Civil Rights Act and State Law Claims

In the Joint ISC Memorandum submitted on August 6, 2014, Plaintiff requested the voluntary dismissal without prejudice of her claims under 42 U.S.C. § 1983 and the laws of Puerto Rico. Docket No. 35. At the Initial Scheduling Conference held on August 14, 2014, Plaintiff reiterated her dismissal request for these claims. Docket No. 39 at 2. Therefore, pursuant to Plaintiff's request of voluntary dismissal, this Court hereby dismisses these claims without prejudice.

Civil No. 14-1331 (JAG)                                                                          19

## CONCLUSION

For the reasons outlined above, the Court GRANTS Defendants' Motion to Dismiss as to Plaintiff's disability discrimination claims under the ADA and the Rehabilitation Act and DENIES Defendants' Motion to Dismiss as to Plaintiff's retaliation claim under the ADA.

Therefore, Plaintiff's disability discrimination claims under the ADA and the Rehabilitation Act are hereby dismissed WITH PREJUDICE and Plaintiff's claims under §1983 and the laws of Puerto Rico are hereby dismissed WITHOUT PREJUDICE. Partial judgment shall be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 13th day of February, 2015.


                                                         s/ Jay A. Garcia-Gregory
                                                         JAY A. GARCIA-GREGORY
                                                         United States District Judge